UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| DEUTSCHE BANK TRUST COMPANY AMERICAS, in its capacity as successor indenture trustee for certain series of Senior Notes, LAW DEBENTURE TRUST COMPANY OF NEW YORK, in its capacity as successor indenture trustee for certain series of Senior Notes, and WILMINGTON TRUST COMPANY, in its capacity as successor indenture trustee for the PHONES Notes, | Civil Action No. **1:11 CV358**<br><br>**J. BECKWITH**<br>(Judge._____)<br><br>**M.J. LITKOVITZ** |

     Plaintiffs,

vs.

AMERICAN ELECTRIC POWER

ELECTROLUX HOME PRODUCTS, INC.
MASTER TRUST

BATL PN-NTRS S&P

BERNARD RABINOWITZ, Indiviually
and as Trustee FBO Bernard Rabinowitz
U/A/D 09-11-2006,

FIFTH THIRD BANK

FIFTH THIRD BANK TRUSTEE

HUSSMAN STRATEGIC GROWTH FUND

HUSSMAN INVESTMENT TRUST

KEYBANK NATIONAL ASSOC.

L.D.C.C.

LABORERS DISTRICT COUNCIL &
CONTRACTORS PENSION FD OF OHIO



FILED
JAMES BONINI
CLERK
11 JUN -3 AM 11:29
U.S. DISTRICT COURT
SOUTHERN DIST OHIO
WEST DIV CINCINNATI

T. ROWE PRICE                                          :
                                                       :
JAMES M. LACHEY                                        :
                                                       :
MICHAEL E. BEE TRUST UAD 10/20/2003                   :
                                                       :
MICHAEL E. BEE, Individually                          :
and as Trustee FBO Michael E. Bee                     :
Trust UAD 10/20/2003                                  :
                                                       :
NATIONWIDE S&P 500 INDEX FUND                         :
                                                       :
NVIT S&P 500 INDEX FUND                               :
                                                       :
OHIO NATIONAL FUND, INC.                              :
                                                       :
RB&W/GAMCO                                             :
                                                       :
GAIL C. SCHLANG                                        :
                                                       :
DUDLEY S. TAFT                                         :
                                                       :
TAFT BROADCASTING CO.                                 :
                                                       :
CONSTANCE TOLBERT YESO                                :
                                                       :
PATIENCE HUMPHREY                                     :
On Behalf of Himself and a Class of Similarly         :
Situated Persons and Entities                         :
                                                       :
RICHARD C. FREEDMAN AND                              :
LYNDA M. FREEDMAN JTWROS                              :
On Behalf of Themselves and a Class of Similarly     :
Situated Persons and Entities                         :
                                                       :
AND                                                    :
                                                       :
PROGRESSIVE CASUALTY INSURANCE                        :
On Behalf of Itself and a Class of Similarly Situated :
Persons and Entities                                  :
                                                       :
                        Defendants.                    :

## CLASS ACTION COMPLAINT

Plaintiffs Deutsche Bank Trust Company Americas ("DBTCA"), in its capacity as successor indenture trustee for a certain series of Senior Notes (as hereinafter defined), Law Debenture Trust Company of New York ("Law Debenture"), in its capacity as successor indenture trustee for a certain series of Senior Notes (as hereinafter defined), and Wilmington Trust Company ("Wilmington Trust" and, together with DBTCA and Law Debenture, "Plaintiffs"), in its capacity as successor indenture trustee for the PHONES Notes (as hereinafter defined), by and through their undersigned counsel, respectfully allege as follows:

## NATURE OF THE ACTION

1.      This action arises from the failed leveraged buyout (the "LBO") of Tribune Company ("Tribune") in 2007 — a transaction that financial and industry analysts contemporaneously characterized as one of the most highly leveraged in history.  The LBO lined the pockets of Tribune's former shareholders (the "Shareholders") with $8.5 billion of cash at the expense of Tribune's creditors, and precipitated Tribune's careen into bankruptcy shortly thereafter.

2.      Plaintiffs seek to avoid and recover, as constructively fraudulent conveyances, all transfers of any proceeds received by each defendant in connection with the LBO.  These transfers may be recovered from the defendants because: (a) Tribune made the challenged transfers without receiving reasonably equivalent value or fair consideration in exchange therefor; and (b) the challenged transfers were made when Tribune– (i) was, or was thereby rendered, insolvent, (ii) was engaged, or was about to engage, in a business or a transaction for which any property remaining with Tribune was an unreasonably small capital, or (iii) intended to incur, or believed that it would incur, debts that would be beyond Tribune's ability to pay as such debts matured.

3

\* \* \*

3.      In mid-2006, Tribune's consolidated revenue was plummeting, its prospects were dimming, and its stock price had dropped to around $27 per share from a high of nearly $40 just twelve months earlier.  The largest Shareholders desperately wanted, and ultimately found, an exit strategy: On April 1, 2007, Tribune's board of directors (the "Tribune Board") approved a bid by billionaire Samuel Zell ("Zell") to acquire Tribune through an extraordinarily leveraged buyout.

4.      In its most basic form, a leveraged buyout is a corporate acquisition where the acquirer purchases the outstanding stock of a target company using borrowed funds that are guaranteed by, or secured by the assets of, the target company itself.  Because leveraged buyout transactions replace the target company's outstanding equity with new debt, the law recognizes that LBOs are inherently risky to the target company's existing creditors and invite application of fraudulent-transfer law when the target company is left unable to satisfy its obligations to its pre-LBO creditors.  As aptly described by one court, "[f]rom a creditor's point of view, an LBO is indistinguishable from a distribution or a gift to shareholders.  The harm is quite like the harm imposed on creditors by donative transfers to third parties, which is one of the most traditional kinds of fraudulent transfers."  Indeed, it is the cashed-out shareholders who receive the principal benefit in an LBO transaction; the target corporation, on the other hand, receives absolutely no benefit to offset the greater risk of operating as a highly leveraged enterprise.

5.      Before the LBO, Tribune and its direct and indirect subsidiaries (collectively, the "Company") had approximately $5.6 billion of funded debt obligations and a positive equity value.  As a result of the LBO, however, the Company increased its funded debt obligations by more than $8 billion and Tribune had a negative equity value.

6.     The LBO was designed as a single transaction that would be implemented in two steps. Tribune executed the first step of the LBO ("Step One") on June 4, 2007, paying some of the Shareholders $4.3 billion (the "Step One Shareholder Transfers") for 52% of the outstanding stock at a premium price of $34 per share. Tribune executed the second step of the LBO ("Step Two") on December 20, 2007, paying Shareholders another $4 billion (the "Step Two Shareholder Transfers" and, together with the Step One Shareholder Transfers, the "Shareholder Transfers") for the remaining outstanding stock, also at the premium price of $34 per share. This transaction was a textbook fraudulent conveyance.

7.     Tribune received, and the Shareholders gave, no value whatsoever in exchange for the Shareholder Transfers. To the contrary, Tribune only received the dubious honor of repurchasing its own stock, and a bloated debtload that tripled to more than $13 billion — billions more than Tribune was actually worth, and nearly ten times the Company's cash flow for 2006 or projected cash flow for 2007. This highly leveraged capital structure was nothing short of reckless.

8.     The Company was a terrible candidate for an LBO. Nearly two-thirds of the Company's cash flow was generated from its newspaper businesses. At the time of the LBO, the publishing industry was in the midst of a deepening, well-publicized structural decline. Print circulation and advertising revenues were falling at a rapid clip across the entire industry as readership migrated online and to other media outlets. The consensus among analysts, market participants, and rating agencies in 2007 was that these challenges were not cyclical and that the declines in circulation and advertising were not likely to abate anytime soon — if ever.

9.     To make matters worse, the Company significantly underperformed industry averages during the years and months leading up to the LBO. In fact, just months before the

close of Step One, both management and independent analysts reported that daily circulation for the Company's largest newspapers was decreasing at a more precipitous rate than the industry average decline.   Consequently, management had no reason to assume that circulation or advertising revenue would improve over the long term or that the Company could make up any shortfalls.

10.     At the time Step One closed, the Company had already failed to meet management's projections for the first several months of 2007.  As of May 2007, year-to-date operating cash flow for the publishing segment was significantly lower than projected, and less than the prior year's actual results for the same period.   In fact, one of Tribune's largest newspapers was reported to have had "one of the worst quarters ever experienced" in the second quarter of 2007.  Consequently, just to meet full-year projections for 2007, the Company would have had to achieve an impossible trifecta during the second half of the year: turn around the negative trend, <u>and</u> recoup the performance deficiencies from the first half, <u>and</u> significantly exceed 2006 performance.

11.     The Company did not achieve any of these objectives.  Rather, between the close of Step One and Step Two, the Company's financial and operating performance continued to deteriorate as significantly as it did rapidly.   As a result, financial and industry analysts repeatedly downgraded their expectations for the Company's performance, Tribune's stock price traded below $23 (a discount of more than 25% to the tender offer price of $34 per share), and Tribune's bond prices fell to almost 50 cents on the dollar for certain tranches of Tribune's longer term debt.

12.     Market watchers and the media had long predicted and widely publicized that the LBO would ruin Tribune.  It did.  Before the close of Step Two, it was clear that the Company

would be unable to meet its operating expenses from existing resources and shortly would be in a full-blown liquidity crisis. Less than one year later, buried in debt and facing a bleak future of looming debt maturities and overwhelming interest payments, Tribune and the majority of its subsidiaries jointly filed for bankruptcy on December 8, 2008 (the "Petition Date").

13.     The jointly administered bankruptcy cases are currently pending in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), Case No. 08-13141 (KJC). On April 25, 2011, the Bankruptcy Court entered an order that, in pertinent part: (a) granted Plaintiffs relief from the automatic stay, to the extent it is applicable, to commence this action and accomplish service; and (b) ordered that this action shall be automatically stayed pending further order of the Bankruptcy Court. Notwithstanding the foregoing, the Bankruptcy Court authorized Plaintiffs immediately to pursue discovery as necessary to prevent any applicable statutes of limitation or time-related defenses from barring the claims asserted in this action. A copy of the Bankruptcy Court order is appended hereto as Exhibit B.

## THE PARTIES

**Plaintiffs**

14.     Plaintiff DBTCA is a trust company that is incorporated in the State of New York with its principal place of business in New York, New York. Deutsche Bank is the successor indenture trustee for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of the holders of, the following debt securities issued by Tribune:

(a)     the 6.25% Notes due November 10, 2026, pursuant to the indenture, dated as of March 1, 1992, between Tribune and Citibank, N.A. ("Citibank") as trustee, successor to The Bank of New York ("BNY"), Bank of Montreal Trust Company ("BMT"), and Continental Bank, N.A.;

(b)      the 7.25% Debentures due March 1, 2013, pursuant to the indenture, dated as of January 30, 1995 (the "1995 Indenture"), between Tribune, successor to The Times Mirror Company ("Times Mirror"), and Citibank as trustee, successor to BNY, Wells Fargo Bank, N.A. and First Interstate Bank of California;

(c)      the 7.50% Debentures due July 1, 2023, pursuant to the 1995 Indenture;

(d)      the 4.875% Notes due August 15, 2010, pursuant to the indenture, dated as of January 1, 1997 (the "1997 Indenture"), between Tribune and Citibank, as trustee, successor to BMT;

(e)      the 5.25% Notes due August 15, 2015, pursuant to the 1997 Indenture; and

(f)      the 5.67% Notes due December 8, 2008, pursuant to the 1997 Indenture.

15.      Plaintiff Law Debenture is a trust company that is incorporated in the State of New York with its principal place of business in New York, New York.  Law Debenture is the successor indenture trustee to DBTCA for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of, the holders of the following debt securities issued by Tribune:

(a)      the 6.61% Debentures due September 15, 2027, pursuant to the indenture, dated as of March 19, 1996 (the "1996 Indenture"), by and between Tribune, successor to Times Mirror, and Citibank, as trustee; and

(b)      the 7.25% Debentures due November 15, 2096, pursuant to the 1996 Indenture.

16.      The debt securities referred to in the two preceding paragraphs collectively have a total face amount of approximately $1.263 billion, and collectively are referred to herein as the

8

"Senior Notes." As of the Petition Date, Tribune owed $1.283 billion, exclusive of accrued post-petition interest, to the holders of the Senior Notes.

17. Plaintiff Wilmington Trust is a trust company that is incorporated in the State of Delaware with its principal place of business in Wilmington, Delaware. Wilmington Trust is the successor indenture trustee for, and has been duly designated to prosecute and resolve the claims asserted herein on behalf of the holders of Exchangeable Subordinated Debentures due 2029 (the "PHONES Notes"), pursuant to the indenture, dated as of April 1, 1999 between Tribune and BMT, as trustee. As of the Petition Date, Tribune owed $1.197 billion, exclusive of accrued post-petition interest, to the holders of the PHONES Notes.

18. The holders of the Senior Notes and the PHONES Notes, as well as their respective successors and assigns, collectively are referred to herein as the "Pre-LBO Noteholders." The Pre-LBO Noteholders have unsatisfied claims against Tribune for the payment of money on account of the Senior Notes and the PHONES Notes in an amount of no less than $2.480 billion (the "Pre-LBO Noteholder Claims"), exclusive of accrued post-petition interest.

19. At the time the Step One Shareholder Transfers were made, the Senior Notes and the PHONES Notes were issued and outstanding.

20. At the time the Step Two Shareholder Transfers were made, the Senior Notes and the PHONES Notes were issued and outstanding.

**Defendants**

21. The caption hereof constitutes a list of defendants who are named parties to this action, and each of whom:

(a) either– (i) was a legal or beneficial owner of greater than $75,000 of

Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with the LBO, or (ii) received greater than $75,000 in proceeds of the Shareholder Transfers; and

(b)     either is– (i) a natural person who resides in or is domiciled in this State, (ii) a juridical entity that is incorporated, organized, established, headquartered, or conducts or is licensed to conduct business within this State, or (iii) a natural person or juridical entity that, upon information or belief, regularly transacts or solicits business in this State, derives substantial revenue from goods used or services rendered in this State, or maintains relations to or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction. (collectively, the "Named Shareholder Defendants").  In addition, Exhibit A appended hereto and incorporated herein, includes, upon information and belief, each Named Shareholder Defendant's last known address as well as the dates and dollar amounts of proceeds of the Shareholder Transfers received by such defendant. To comply with a protective order entered by the Bankruptcy Court, Plaintiffs have redacted certain information from Exhibit A.  Plaintiffs, however, promptly will seek to file an unredacted version of Exhibit A under seal.

22.     Defendant Progressive Casualty Insurance is a juridical entity that is organized in this State and, upon information and belief, has its principal place of business in this State. Progressive Casualty Insurance: (a) was a legal or beneficial owner of greater than $75,000 of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received greater than $75,000 in proceeds of the Shareholder Transfers.

23.     Defendant Patience Humphrey is a natural person who resides in and, upon information and belief, is a citizen of this State.  Patience Humphrey: (a) was a legal or

beneficial owner of greater than $75,000 of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received greater than $75,000 in proceeds of the Shareholder Transfers.

24.     Defendant Richard C. Freedman is a natural person who resides in and, upon information and belief, is a citizen of this State.  Richard C. Freedman: (a) was a legal or beneficial owner of greater than $75,000 of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with Step One or Step Two; or (b) received greater than $75,000 in proceeds of the Shareholder Transfers.

25.     The defendants named in the three preceding paragraphs collectively are referred to herein as the "Shareholder Class Representatives."     Each of the Shareholder Class Representatives is named: (a) individually as– (i) a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with the LBO, or (ii) a recipient of proceeds of the Shareholder Transfers; and (b) in its capacity as a representative for all Shareholder Class Members (as hereinafter defined).

## CLASS ALLEGATIONS

26.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs seek certification of a defendant class (the "Shareholder Class") comprising:

> All natural persons and juridical entities, other than Excluded Persons (as hereinafter defined), that: (a) either– (i) reside in or are domiciled in this State, (ii) are incorporated, organized, established, or conduct or are licensed to conduct business within this State, or (iii) regularly transact or solicit business in this State, derive substantial revenue from goods used or services rendered in this State, maintain relations to or engage in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction; and (b) either– (i) was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune in connection with the LBO, or (ii) received proceeds of the Shareholder Transfers.

27.     The following natural persons and juridical entities (the "Excluded Persons") are excluded from the Shareholder Class:

(a)     all Named Shareholder Defendants (other than the Shareholder Class Representatives) that are effectively served with a summons and complaint within the time period required by Rule 4(m) of the Federal Rules of Civil Procedure;

(b)     all named defendants properly sued in any other action commenced by Plaintiffs to avoid and recover the transfer of any proceeds received in connection with the LBO that are effectively served with a summons and complaint within the times period required by Rule 4(m) of the Federal Rules of Civil Procedure or analogous state rule; and

(c)     all citizens of either New York or Delaware for purposes of 28 U.S.C. §1332.

28.     Upon information and belief, the Shareholder Class comprises no less than 700 natural persons and juridical entities (each, a "Shareholder Class Member").  Because of the large number of Shareholder Class Members, joinder of all such defendants in a single action is impracticable.

29.     Numerous questions of law and fact are common to all Shareholder Class Members.  These common questions of law and fact include, but are not limited to:

(a)     Whether Tribune received reasonably equivalent value or fair consideration in exchange for the Shareholder Transfers;

(b)     Whether, at the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the sum of Tribune's debts was greater than all of Tribune's assets at a fair valuation;

(c)     Whether, at the time the Shareholder Transfers were made, Tribune was engaged in a business or a transaction, or was about to engage in business or a transaction, for which Tribune was left with unreasonably small capital in relation to the business or transaction; and

(d)     Whether, at the time the Shareholder Transfers were made, Tribune intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

30.     Any claims against and claimed defenses of the Shareholder Class Representatives are typical of the claims against and claimed defenses of the Shareholder Class Members.  The claims against and claimed defenses of the Shareholder Class Members arise out of the same factual circumstances involving the LBO and the Shareholder Transfers.

31.     The Shareholder Class Representatives collectively face an approximate risk of loss of at least $1,298,800.  Therefore, the Shareholder Class Representatives will fairly and adequately protect the interests of the Shareholder Class Members and have as much or more incentive to vigorously defend against the claims asserted herein than would any Shareholder Class Member.

32.     The various claims asserted on a class basis in this action are properly certifiable pursuant to Rule 23(b)(1) of the Federal Rules of Civil Procedure because prosecuting separate actions by or against each Shareholder Class Member would create a risk of: (a) inconsistent or varying adjudications with respect to each Shareholder Class Member that would establish incompatible standards of conduct; or (b) adjudications with respect to each Shareholder Class Member that, as a practical matter, would– (i) be dispositive of the interests of the other Shareholder Class Members not parties to the individual adjudications, or (ii) substantially

impair or impede the ability other Shareholder Class Members not parties to the individual adjudications to protect their interests.

33.     The various claims asserted on a class basis in this action are properly certifiable pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because: (a) the questions of law or fact common to the Shareholder Class Members predominate over any questions affecting only individual Shareholder Class Members; and (b) a defendant class action is superior to other available methods for fairly and efficiently adjudicating this controversy.  A defendant class action will avoid — and be far more efficient than prosecuting — a multiplicity of individual adjudications with respect to each Shareholder Class Member, thereby conserving the resources of the parties and of the Court.

## JURISDICTION AND VENUE

34.     Pursuant to 28 U.S.C. §1332, this Court has original subject-matter jurisdiction over this action because: (a) Plaintiffs and each of the Named Shareholder Defendants are citizens of different states; (b) Plaintiffs and each of the Shareholder Class Representatives are citizens of different states; and (c) the amount in controversy as to each of the Named Shareholder Defendants and each of the Shareholder Class Representatives exceeds $75,000, exclusive of interest and costs.  Pursuant to 28 U.S.C. § 1367(a), this Court has supplemental jurisdiction over Plaintiffs' claims against each of the Shareholder Class Members because such claims are so related to the claims within the original subject-matter jurisdiction of this Court that they form part of the same case or controversy.

35.     Alternatively, pursuant to 12 U.S.C. § 632, this Court has original subject-matter jurisdiction over this action because: (a) upon information and belief, at least one of the Named Shareholder Defendants is a corporation that is organized under the laws of the United States;

and (b) it arises out of transactions that involve international or foreign banking, international or foreign financial operations, either directly or through the agency, ownership, or control of branches or local institutions in dependencies or insular possessions of the United States or in foreign countries.

36.     This Court has personal jurisdiction over each of the Named Shareholder Defendants, each of the Shareholder Class Representatives, and each of the Shareholder Class Members (collectively, the "Shareholder Defendants") to the extent that a Shareholder Defendant is: (a) a natural person who resides in or is domiciled in this State; (b) a juridical entity that is incorporated, organized, established, headquartered, or conducts or is licensed to conduct business within this State; or (c) a natural person or juridical entity that regularly transacts or solicits business in this State, derives substantial revenue from goods used or services rendered in this State, or maintains relations or engages in any other persistent course of conduct in this State sufficient to afford a basis for the exercise of personal jurisdiction.

37.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (a) both– (i) at least one or more of the Named Shareholder Defendants or Shareholder Class Representatives resides in this District, and (ii) all of the Shareholder Defendants reside in this State; (b) a substantial part of the events or omissions giving rise to the claims in this action occurred, or a substantial part of the property that is the subject of this action is situated, in this District; or (c) at least one or more of the Named Shareholder Defendants or Shareholder Class Representatives resides in this District, to the extent that there is no district in which this action may otherwise be brought.

## FACTUAL BACKGROUND

**The Company's Business and Historical Performance**

38.     Founded in 1847, Tribune reaches more than 80% of U.S. households through its newspapers and other publications, its television and radio broadcast stations and cable channels, and its other entertainment offerings.  Headquartered in Chicago, Illinois, Tribune's operations are conducted through two primary business segments.  Tribune's publishing segment owns major newspapers in many of the most significant markets in the United States, including the Chicago Tribune, the Los Angeles Times, the Baltimore Sun, the South Florida Sun-Sentinel, the Orlando Sentinel, and Newsday.   Tribune's broadcasting and entertainment segment owns numerous radio and television stations in major markets.

**The Company's Financial Condition Deteriorates**
**and the Shareholders Begin Agitating for Change**

39.     In June 2000, Tribune merged with Times Mirror, which was owned by the Chandler family.  As a result of this merger, the Chandler family, through Chandler Trust No. 1 and Chandler Trust No. 2 (collectively, the "Chandler Trusts"), became Tribune's second largest shareholder and was awarded three seats on the Tribune Board.

40.     The market did not react well to the merger with Times Mirror and, over the course of the next few years, the Company experienced a steady decline in revenues, profitability, and its stock price.  In response, Tribune took repeated steps to reduce costs by liquidating assets and shedding jobs.  But the numbers continued to drop.  By 2006, the Company's profitability was exhibiting quarter-over-quarter declines compared to both 2004 and the majority of 2005.

41.     In or about February 2006, the Chandler Trusts' patience ran out and they began to complain about the Company's performance and to criticize the Tribune Board.  The Chandler

16

Trusts admonished the Tribune Board that, absent an upturn in Tribune's stock price, the Chandler Trusts would themselves begin exploring a "fundamental transaction" involving Tribune.

42.     In May 2006, the Tribune Board decided to engage in a leveraged recapitalization pursuant to which it would borrow money to repurchase up to 75 million shares of its common stock.  The Chandler Trusts' three representatives on the Tribune Board, however, voted against the transaction.

43.     In a publicly filed letter to the Tribune Board on June 13, 2006, the Chandler Trusts advised that they would not participate in the planned repurchase.  The Chandler Trusts complained that "[o]ver the past two years, Tribune has significantly underperformed industry averages and there is scant evidence to suggest the next two years will be any different."  The Chandler Trusts explained that "[t]he gravity of management's failure to address fundamental strategic issues is apparent from the precipitous decline in stock value over the past three and a half years. . . . [S]ince the beginning of 2003 (when current management of Tribune was put into place), the value of Tribune's stock has declined over 38% — substantially worse than both the newspaper peer group (down 8.8%) and the broadcasting peer group (down 29%)."  The Chandler Trusts added that "it is the time for prompt, comprehensive action."

44.     On June 27, 2006, Tribune nonetheless announced that it had elected to proceed with the repurchase of 55 million shares through a public tender offer and a private transaction (the "2006 Repurchase") with the Robert R. McCormick Tribune Foundation and the Cantigny Foundation (collectively, the "Foundations" and, together with the Chandler Trusts, the "Large Shareholders") at a cost of nearly $1.8 billion which was financed with debt.  As a result of the

2006 Repurchase, the Chandler Trusts became Tribune's largest stockholders and the Foundations continued to be major shareholders.

45.     Unfortunately, the 2006 Repurchase failed to raise Tribune's stock price.  To make matters worse, as a result of the 2006 Repurchase, the Company's debt materially increased by almost 50% and Moody's Investors Service cut Tribune's bond rating to "junk" status.

46.     After the failed 2006 Repurchase, the Large Shareholders redoubled their efforts to effect change at Tribune.  Because of the Chandler Trusts' publicly expressed discontent and their increasing pressure on management, in September 2006, the Tribune Board announced that it had established a special committee to oversee management's exploration of transactions that might maximize the value of Tribune stock.

**The LBO Is Proposed and Approved**

47.     In late January 2007, billionaire investor Zell emerged as a potential buyer for Tribune.  Before Zell's emergence on the scene, the Tribune Board had been considering transactional alternatives to placate the Large Shareholders, including a possible sale of the entire Company or select assets, as well as an internal recapitalization.

48.     Zell proposed a wholly new option.  On or about February 6, 2007, Zell wrote to the Tribune Board and proposed to acquire Tribune in an LBO transaction.

49.     Under Zell's proposal, the Company would borrow nearly $11 billion — while Zell would invest just $315 million of his own money — to buy out the Shareholders.  In other words, Zell sought to acquire the Company by putting up less than 3% of the risk capital and shifting all of the risk of the transaction onto the shoulders of the Company's existing creditors.

50.　　On March 10, 2007, management informed Zell that it was skeptical of proceeding with his LBO proposal because of its high degree of leverage.  Only a week before the LBO was announced, a senior Tribune officer wrote to Tribune's treasurer after reviewing financial projections: "[I]f I am reading this right, we have a pretty narrow band for success under the [deal]–i.e., if we are off plan by 2% we have no value in the ESOP for 5 years."  The treasurer responded and confirmed: "yes, if we hit the down 2 case there is no equity value in the first 5 yrs."

51.　　However, the prospect of obtaining a windfall for themselves and the Shareholders was too hard to resist.  Management dismissed the concerns over the Company's financial future and approved the LBO on April l, 2007.

52.　　The merger agreement contemplated a single transaction in two steps.  In connection with Step One, Tribune would purchase 52% of Tribune's common stock in a tender offer at the premium price of $34 per share.  In connection with Step Two, Tribune would purchase all of the remaining Tribune common stock at the same premium price of $34 per share in a merger that would ultimately take Tribune private.  To finance the deal, the Company committed to borrow nearly $11 billion — more than $8.2 billion of which was funneled to the Shareholders as Shareholder Transfers.  The remainder of the loan proceeds was used to pay lender and advisor fees, transaction costs and expenses, and to refinance the debt incurred in connection with the 2006 Repurchase.

53.　　Notwithstanding its two-step structure, the LBO was conceived, promoted, and proceeded as (and, in economic reality, was) an integrated transaction in which neither Step One nor Step Two was intended to occur on its own.  In fact, had there been a way to structure the LBO so that only a single step were necessary, the LBO would have been structured accordingly.

54.     The Tribune Board approved both Step One and Step Two at the same time, and promoted the LBO as a single transaction, indicating that management intended both steps to constitute one integrated transaction.  For example, on April 2, 2007, Tribune publicly announced that it had agreed to the Zell proposal.  Tribune's press release stated, in pertinent part:

> With the completion of its strategic review process, Tribune Company today announced a transaction which will result in the company going private and Tribune shareholders receiving $34 per share.  Sam Zell is supporting the transaction with a $315 million investment.  Shareholders will receive their consideration in a two-stage transaction.
>
> Upon completion of the transaction, the company will be privately held, with an Employee Stock Ownership Plan ('ESOP') holding all of Tribune's then outstanding common stock and Zell holding a subordinated note and a warrant entitling him to acquire 40 percent of Tribune's common stock.  Zell will join the Tribune board upon completion of his initial investment and will become chairman when the merger closes.
>
> The first stage of the transaction is a cash tender offer for approximately 126 million shares at $34 per share.  The tender offer will be funded by incremental borrowings and a $250 million investment from Sam Zell . . . .
>
> The second stage is a merger expected to close in the fourth quarter of 2007 in which the remaining publicly-held shares will receive $34 per share.  Zell will make an additional investment of $65 million in connection with the merger, bringing his investment in Tribune to $315 million.

55.     The primary structural mechanism used to execute the LBO was created for the sole purpose of generating certain tax benefits.  Those benefits, however, could only be realized upon consummation of Step Two.  Thus, the LBO made economic sense only if Step Two closed and the anticipated tax savings could be realized.

56.     The lenders that financed the LBO analyzed Step One and Step Two concurrently, and the commitment letters for both steps of the transaction were executed at the same time,

cross-referenced each other, and obligated the lenders to provide financing for Step One and Step Two.  Moreover, the same exact lenders financed both steps of the LBO pursuant to a single credit agreement that interlocked the financing of both steps with a loss-sharing provision and based the fees and interest rate associated with the Step One loans upon the Company's debt load following Step Two.  On March 28, 2007, Tribune's treasurer instructed that a draft press release should state that "Tribune has received committed financing from Citigroup, Merrill Lynch and JPMorgan sufficient to complete both steps of the transaction."

57.     As was widely acknowledged by all of the parties involved, shareholder approval for the LBO was virtually guaranteed from the LBO's inception as a result of a voting agreement with the Chandler Trusts.  Indeed, after Tribune purchased half of its outstanding common stock in connection with Step One, nearly half of the remaining shares were held by the Large Shareholders and others directly under Zell's control.

58.     At Tribune's shareholder meeting on August 21, 2007, almost 65% of Tribune's common stock outstanding (and 97% of the shares that were voted) approved Step Two.  In the press release announcing the results of the shareholder vote, Tribune's former Chairman and CEO was quoted as saying, "With financing fully committed, we anticipate closing the transaction in the fourth quarter, following FCC approval and satisfaction of the other closing conditions."

59.     The parties and industry experts also believed that the LBO would obtain regulatory approval from the FCC, one of the closing conditions. As recognized by rating agencies and news analysts, FCC approval in these circumstances was expected.  On May 3, 2007, for example, Fitch Ratings reported its view that the necessary regulatory approvals associated with Step Two would be obtained.

**The Disastrous Consequences of the LBO Were Foreseeable (and Foreseen)**

60.     The Shareholders approved the LBO — and reaped the financial benefits of the Shareholder Transfers — even though they knew, should have known, or had reason to know that it would render Tribune insolvent, inadequately capitalized, or unable to satisfy its obligations.  Indeed, as made clear by a cascade of contemporaneous news reports and ratings downgrades, the generally unfavorable reaction to the LBO came swiftly and loudly.

61.     On April 3, 2007 — just one day after the deal was announced — a Goldman Sachs analyst reported that "with estimated annual interest expense of over $1bn/yr and estimated EBITDA of $1.3bn, the transaction leaves little room for error, particularly in this challenging newspaper operating environment."  The analyst pointed out that the LBO's high leverage left Tribune in a "precarious financial position."

62.     A Lehman Brothers analyst reported on April 26, 2007 that the "[p]roposed deal leaves TRB with debt-to-2007E-EBITDA of 11.5x . . . which we believe is far too high for secularly declining businesses. . . .   Debt payments should overwhelm EBITDA, by our calculations."

63.     On March 16, 2007, that same Lehman Brothers analyst warned that "putting this much debt on Tribune's newspapers and TV stations is way too risky and makes it very possible to put the company into bankruptcy with or without the added tax savings" that Zell anticipated.

64.     On March 29, 2007, Standard & Poor's had a similar prediction and sent a letter to Tribune's treasurer, stating that it would downgrade Tribune's credit rating because "the company is expected to default in 2009 when its cash flow and revolving credit capacity are unable to cover its interest expense, capital expenditures, and working capital needs."

65.    On August 14, 2007, a Lehman Brothers analyst once again warned:

> [W]e continue to think the probability of significant financial difficulty at Tribune is much, much greater than 50%/50% — given the secularly declining fundamentals and the large amount of leverage involved which is currently at 9.6 times 2008E EBITDA and would rise to nearly 12 times if the second tranche occurs. . . . So by our calculations, if the second tranche of the privatization deal happens, the company will not be able to cover the estimated annual interest expense from operations let alone have excess free cash flow to pay down debt each year.

The analyst's cautionary warnings, of course, proved accurate.

66.    Spooked by the enormous leverage being foisted upon the Company in connection with the LBO, all of the major rating agencies consistently and continuously downgraded Tribune's debt ratings — ultimately to "junk" or "near junk" status — on nearly a dozen occasions from the time the deal was announced until Tribune filed for bankruptcy.

67.    Financial analysts and rating agencies were not alone in recognizing the devastating consequences of the proposed LBO.  As soon as the LBO was announced, a growing chorus of news outlets also began reporting the substantial risk of the proposed transaction, openly questioned the proposal's soundness, and highlighted the crushing debtload that the LBO would create.

68.    For example, on April 2, 2007, the Baltimore Sun — one of Tribune's own newspapers — questioned the wisdom of the proposed LBO: "The deal, which would return Tribune to private ownership, would make the company one of the most heavily indebted enterprises in the media industry at a time of falling readership and declining advertising revenues."  Tribune's rivals were "dumbfounded" by the deal, observed the reporter.

69.    On April 3, 2007, Bloomberg News quoted an industry analyst who stated that, for the LBO to succeed, Tribune either had to significantly cut costs or experience "significant growth."  The analyst remarked that "There just isn't a scenario that shows how this industry or

this company is going to get significantly better."  The article essentially predicted that, absent a miracle, Tribune could not survive the LBO.

71.     The very same day, The New York Times reported that the proposed sale came with some "big risks," observing that the LBO "would saddle the company with $13 billion in debt even as advertising sales and circulation decline."

71.     In an April 4, 2007 article entitled "How Will Tribune Pay Its Debts?" the Wall Street Journal quoted a Barclays Capital analyst who indicated that "We think it is possible that Tribune is leveraged higher than the total assets of the company after taxes."

72.     On April 6, 2007, The New York Times characterized the proposed LBO as "one of the most absurd deals ever."

73.     On April 16, 2007, Businessweek also raised serious concerns as to the highly leveraged nature of the proposed LBO:

> How leveraged?  The just-announced deal orchestrated by investor Sam Zell leaves the company with more than $13 billion in debt. To put that in its proper perspective, Tribune's cash flow in '06— earnings before interest, taxes, depreciation, and amortization, or EBITDA—was $1.3 billion.  Thus its debt exceeds last year's EBITDA by about ten times.  This is an angina-inducing multiple even for veteran media players accustomed to playing with debt, some of whom get nervous above six.  And Tribune's cash flow comes in large part from big-city Old Media properties, which are not noted for their stability right now.  (Tribune's revenues declined by more than 5% in February.)

74.     On December 3, 2007, Barron's echoed this concern, reporting that "[t]he combination of a weakening economy and heavy debt loads is causing trouble for many companies that went private in leveraged buyouts since the start of 2006."  While noting the general increase in risk of LBOs, Barron's called-out Tribune in particular:  "One pending LBO that could be a financial disaster is Tribune (TRB)."

75.    Financial-market participants also recognized, almost immediately, that Tribune inevitably would crumble under the weight of debtload imposed by the LBO.  Prices for Tribune credit-default swaps ("CDS"), a form of "insurance" that would pay out if Tribune defaulted on its obligations, skyrocketed on the day the LBO was announced and continued to soar through the close of Step Two.

76.    A June 7, 2007 Bloomberg News article chronicled the ever-increasing price of a Tribune CDS, and the ever-increasing risk of the LBO to Tribune's creditors:

> Leveraged buyouts are financed by adding debt onto the target company, increasing the risk that existing bonds and loans may not be repaid.  In Tribune's case, the perceived risk of owning its 5-year bonds tripled after Zell's buyout was reported, based on credit-default swap prices.

77.    On July 20, 2007, Bloomberg News reiterated what the climbing CDS price indicated in terms of Tribune's chances of survival after the LBO:

> Tribune Co. has a 50-50 chance of missing interest payments on some of the $13 billion in debt it will have after real estate investor Sam Zell buys the company, trading in the company's credit-default swaps shows.
>
> Prices of the swaps, financial contracts used to speculate on a company's ability to repay debt, have jumped $331,000 since the first step in the sale was completed in May.  It costs $770,000 to protect $10 million of Tribune bonds for five years, according to CMA Datavision, indicating a more than 50 percent risk of default. That's up from 32 percent on May 24, based on a JPMorgan Chase & Co. pricing model.

The article went on to explain that "Tribune swaps prices imply investors consider the company the fourth-riskiest debt issuer among the almost 1,200 worldwide whose credit-default swaps were quoted this week by London-based CMA."

78.    Although the risks to the Company's creditors were apparent, the Shareholders overwhelmingly supported the LBO: 92% of Tribune's stock was tendered at Step One, and 97%

percent of voting Shareholders voted in favor of Step Two.  An August 21, 2007 article in Medill Reports quoted one Tribune shareholder who succinctly summarized the Shareholders' rationale for approving the deal: "If you're making money on [the deal], sure, what the hell."

**The Company's Financial Impairment and Flawed Solvency Opinions**

79.     Because of the Company's moribund financial prospects and the extraordinarily leveraged nature of the LBO, one of the closing conditions — securing viable solvency opinions in connection with both Step One and Step Two — was poised to jeopardize the deal.  And finding a firm to provide the requisite opinions turned out to be no easy task.  Indeed, Valuation Research Corporation ("VRC"), the financial advisory firm that ultimately provided Tribune with the necessary solvency opinions, was the last-ditch choice for Tribune after other firms declined the engagement.

80.     Tribune first approached Houlihan Lokey Howard & Zukin ("Houlihan"), a prominent solvency opinion firm.  Houlihan, however, expressed serious reservations regarding its ability to provide a solvency opinion in connection with such a highly leveraged transaction and declined even to accept the engagement.  Tribune scrambled to find another firm that might provide the necessary opinions.

81.     VRC was aware of Houlihan's reservations about the proposed LBO and recognized that Houlihan's reluctance raised the risk profile associated with the project.  Due to the risk attached to the highly leveraged deal, and Houlihan's disinclination to get involved, VRC was able to demand among the highest fees VRC had ever received for solvency opinion work.  In exchange, VRC provided the Tribune Board with: (a) written opinions, dated May 9, 2007, and May 24, 2007, as to the solvency and capital adequacy of the Company after giving effect to Step One; and (b) a written opinion, dated December 20, 2007, as to the solvency and capital adequacy of the Company after giving effect to Step Two.

82. Two uncommon aspects of VRC's engagement are noteworthy. First, VRC was instructed to ignore the generally accepted definition of "fair value" and, instead, to measure fair value in relation to a willing buyer and a willing seller <u>both of whom receive the favorable federal income tax treatment of the ESOP</u>. As a result of this built-in limitation, VRC never offered any opinion as to whether Tribune or the Company would be solvent if it were to be acquired by an entity that did not receive the uniquely favorable federal income tax treatment. Second, VRC was excused from the typical obligation to affirmatively investigate and skeptically evaluate any information provided by management. Consequently, VRC never independently assessed the (un)reasonableness of management's unjustifiably optimistic projections upon which all of VRC's solvency opinions were based.

**Step One**

83. VRC's Step One solvency analysis in May 2007 was based upon financial projections that were finalized by management and approved by the Tribune Board in February 2007 (the "February Projections").

84. The February Projections were substantially higher than the Company's actual operating results. For the three months from March through May 2007, publishing revenues and earnings were below plan by $50.6 million and $29.7 million, respectively. During the same period, broadcasting revenues and earnings were below plan by $9.4 million and $4.6 million, respectively.

85. Management, who received weekly "flash reports," was fully aware that the February Projections were outdated and unreliable almost immediately after they were finalized and approved. Despite this awareness, management persistently declined to revise and update the February Projections until long after Step One had closed.

86.     As a result of the foregoing, the February Projections were unreasonable and unreliable.  Notwithstanding management's acknowledgements that the Company's actual results were lagging the February Projections, those projections were not updated before VRC's Step One solvency opinions were issued.  In fact, management failed to provide any updated financial projections to VRC until late September 2007.

87.     The solvency opinions provided by VRC at Step One were substantially flawed and unreliable for a number of reasons, including but not limited to:

(a)     VRC blindly used the outdated, unreasonable, and unwarranted February Projections supplied by management without any critical analysis.

(b)     VRC artificially separated the two steps of the LBO for purposes of its Step One solvency analysis despite the fact that the LBO was conceived of and promoted as a single, integrated transaction for which financing was fully committed.

(c)     VRC improperly modified the conventional definition of "fair market value" to mean that a "fair market" buyer would be structured to receive the same favorable tax treatment as the ESOP in connection with the LBO.

(d)     VRC inappropriately reduced the weight given to its discounted cash flow analysis and increased the weight given to its higher comparable transactions analysis to increase Tribune's overall valuation.

(e)     VRC incorrectly assumed that Tribune would be able to refinance its debts as they matured.

88.     As of June 4, 2007, the correct fair market value of the Company's assets was approximately $10.99 billion.  Tribune had obligated itself to consummate an LBO that would saddle it with debt and contingent liabilities of approximately $14.03 billion.  As a consequence,

and as of the closing of Step One, the Company was insolvent to the extent of approximately $3.04 billion.

89. Of course, the Company had been highly leveraged in comparison to its peers even before the LBO. After Step One, however, its debt-to-EBITDA ratio further skyrocketed to 11.4 — more than six times that of its most highly leveraged competitor, and more than eight times that of the industry average. The Company's debt-to-equity ratio (book value) plummeted below zero, to a ratio of approximately negative 3.5.

90. The Company could not service the significant amount of leverage imposed by the LBO and lacked adequate capital liquidity to operate its business following Step One. The Company had an interest-coverage ratio of 1:1, the lowest among its peers, and was unlikely to be able to cover its interest expense. The Company's operating cash flows were also insufficient to meet its debt service obligations.

91. Following Step One, the Company had insufficient capital resources to fund its operations and service its debt while maintaining an adequate cushion for reasonably foreseeable stresses, downturns, and contingencies.

**Step Two**

92. VRC's Step Two solvency analysis exhibited many of the same flaws and skewed assumptions as VRC's Step One solvency analysis, including VRC's novel and improper definition of "fair market value" and the inappropriate equal weighting that VRC assigned to its different valuation methodologies.

93. In addition, VRC's Step Two solvency analysis in December 2007 was based upon unreasonable and unreliable financial projections that were updated by management and presented, in part, to the Tribune Board in October 2007 (the "October Projections").

94.     The October Projections were, to some degree and in the near-term, downward revisions of the February Projections.  However, despite the continued deterioration of the Company's performance after Step One closed, certain critical forecasts in the October Projections were dramatically revised <u>upward</u> from the February Projections.

95.     For example, the October Projections assumed that, as early as 2009, Tribune's internet-based business would generate significantly greater revenues than anticipated in the February Projections and, thereby, mitigate the continuing decline in Tribune's traditional publishing business.  Yet, the internet-based business had already failed to meet management expectations in 2007.

96.     The October Projections also forecasted that, beginning in 2013 and accelerating through 2017, the Company's revenue would significantly outperform the February Projections on a consolidated basis.  It was patently unreasonable, however, for the Company to assume that each of the five years following the 2012 election year would also enjoy the benefit of the bump in revenue occasioned by swells of political advertising.

97.     As a result of the foregoing, the October Projections were unreasonable and unreliable.  Nonetheless, VRC indiscriminately relied upon the October Projections when preparing its Step Two solvency opinion.

98.     As of December 20, 2007, the correct fair market value of the Company's assets was approximately $10.44 billion.  The Company's debt and contingent liabilities totaled approximately $13.76 billion.  As a consequence, as of the closing of Step Two, the Company was insolvent to the extent of approximately $3.32 billion.

99.     Following Step Two, the Company was excessively leveraged, experiencing a debt-to-EBITDA ratio that was nearly double that of its closest peer, and more than eight times

higher than the average of its other peers. In addition, the Company was the only one of its peers that had a negative debt-to-equity ratio, and had the lowest interest-coverage ratio among its peers.

**The Aftermath of the LBO**

100. Because of the LBO, Tribune's funded debtload soared from more than $5 billion to nearly $14 billion — ten times greater than the Company's actual cash flow for 2006 or projected cash flow for 2007.

101. As was widely predicted by a cacophony of financial analysts, industry experts, rating agencies, market participants, and media outlets alike, the Company's financial health deteriorated rapidly after the LBO closed. On July 14, 2008, for example, the Associated Press reported that the Los Angeles Times planned to cut 250 positions because the Company was "struggling to service th[e] debt" taken on in connection with the LBO. None of Tribune's cost-cutting measures, however, could forestall the inevitable.

102. Buried in debt, and facing a bleak future of looming debt maturities and overwhelming interest payments, Tribune and its most valuable operating subsidiaries jointly filed for bankruptcy on December 8, 2008.

103. Tribune's own publicly filed estimates in the Bankruptcy Court valued the Company at approximately $6.1 billion in 2010 — less than half of the Company's debtload at the close of Step Two.

## COUNT ONE
**(Constructive Fraudulent Transfer Against the Named Shareholder
Defendants and the Shareholder Class Representatives,
individually and as representatives of the Shareholder Class
Pursuant to N.Y. DEBT. & CRED. §§ 273, 278 & 279)**

104. Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

105.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

106.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

107.     Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

108.     At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the present fair salable value of Tribune's assets was less than the amount that would have been required to pay Tribune's probable liabilities on its existing debts as they became absolute and matured.

109.     Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT TWO
### (Constructive Fraudulent Transfer Against the Named Shareholder Defendants and the Shareholder Class Representatives, individually and as representatives of the Shareholder Class Pursuant to N.Y. DEBT. & CRED. §§ 274, 278, & 279)

110.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

111.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

112.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

113.    Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

114.    At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which the property remaining with Tribune after making the Shareholder Transfers was an unreasonably small capital.

115.    Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT THREE
**(Constructive Fraudulent Transfer Against the Named Shareholder
Defendants and the Shareholder Class Representatives,
individually and as representatives of the Shareholder Class
Pursuant to N.Y. DEBT. & CRED. §§ 275, 278, & 279)**

116.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

117.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

118.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

119.    Tribune did not receive, and none of the Shareholder Defendants gave, fair consideration in exchange for the Shareholder Transfers.

120.   At the time the Shareholder Transfers were made, Tribune intended or believed that it would incur debts beyond its ability to pay as they matured.

121.   Accordingly, the Shareholder Transfers should be set aside and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT FOUR
### (Constructive Fraudulent Transfer Against the Named Shareholder Defendants and the Shareholder Class Representatives, individually and as representatives of the Shareholder Class Pursuant to 740 ILL. COMP. STAT. 160/5(a)(2), 160/8, & 160/9)

122.   Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

123.   On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

124.   On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

125.   Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

126.   At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

127.   At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

128.     Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT FIVE
**(Constructive Fraudulent Transfer Against the Named Shareholder
Defendants and the Shareholder Class Representatives,
individually and as representatives of the Shareholder Class
Pursuant to 740 ILL. COMP. STAT. 160/6(a), 160/8, & 160/9)**

129.     Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

130.     On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

131.     On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

132.     Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

133.     At the time the Shareholder Transfers were made or as a result of making the Shareholder Transfers, the sum of Tribune's debts was greater than all of Tribune's assets at a fair valuation.

134.     Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT SIX
### (Constructive Fraudulent Transfer Against the Named Shareholder Defendants and the Shareholder Class Representatives, individually and as representatives of the Shareholder Class Pursuant to MASS. GEN. LAWS ch. 109A, §§ 5(a)(2), 8, & 9)

135.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

136.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

137.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

138.    In connection with Step One and Step Two, each Shareholder who was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune: (a) appointed Computershare Trust Company, N.A. ("Computershare"), located in Braintree, Massachusetts, as such Shareholder's agent and attorney-in-fact to the full extent of its right with respect to such shares; (b) delivered stock certificates and other required documents to Computershare in Massachusetts; and (c) received proceeds of the Shareholder Transfers from Computershare.

139.    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

140.    At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

141.    At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

142.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## COUNT SEVEN
**(Constructive Fraudulent Transfer Against the Named Shareholder
Defendants and the Shareholder Class Representatives,
individually and as representatives of the Shareholder Class
Pursuant to MASS. GEN. LAWS ch. 109A, §§ 6(a), 8, & 9)**

143.    Plaintiffs repeat and reallege each and every allegation in all prior paragraphs, which are incorporated by reference as if set forth fully herein.

144.    On or after June 4, 2007, Tribune transferred approximately $4.3 billion of Step One Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step One of the LBO.

145.    On or about December 20, 2007, Tribune transferred approximately $4.0 billion of Step Two Shareholder Transfers to the Shareholders — including the Shareholder Defendants — in connection with Step Two of the LBO.

146.    In connection with Step One and Step Two, each Shareholder who was a legal or beneficial owner of Tribune's common stock that was purchased, repurchased, or redeemed by Tribune: (a) appointed Computershare as such Shareholder's agent and attorney-in-fact to the full extent of its right with respect to such shares; (b) delivered stock certificates and other required documents to Computershare in Massachusetts; and (c) received proceeds of the Shareholder Transfers from Computershare.

147.    Tribune did not receive, and none of the Shareholder Defendants gave, reasonably equivalent value in exchange for the Shareholder Transfers.

148.    At the time the Shareholder Transfers were made, Tribune was engaged or was about to engage in a business or transaction for which Tribune's remaining assets were unreasonably small in relation to the business or transaction.

149.    At the time the Shareholder Transfers were made, Tribune intended to incur or believed or reasonably should have believed that it would incur debts beyond its ability to pay as they became due.

150.    Accordingly, the Shareholder Transfers should be avoided and recovered to the extent necessary to satisfy the Pre-LBO Noteholder Claims.

## RESERVATION OF RIGHTS

Plaintiffs reserve the right, to the extent permitted by applicable law or by agreement, to assert any claims relating to the subject matter of this action against any third party.

## PRAYER FOR RELIEF

WHEREFORE, by reason of the foregoing, Plaintiffs respectfully request that the Court grant the following relief:

(a)    certifying the Shareholder Class pursuant to Rules 23(a)(1) or 23(a)(3) of the Federal Rules of Civil Procedure;

(b)    entering a judgment against the Named Shareholder Defendants and the Shareholder Class Representatives, individually and as representatives of the Shareholder Class, finding that the Shareholder Transfers constitute constructively fraudulent transfers;

(c)    avoiding the Shareholder Transfers to the extent necessary to satisfy the Pre-LBO Noteholder Claims, plus post-petition interest;

(d)     granting recovery of all amounts paid to each of the Shareholder Defendants in connection with the Shareholder Transfers to the extent necessary to satisfy the Pre-LBO Noteholder Claims;

(e)     granting an attachment against the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(f)     imposing a constructive trust on the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(g)     granting an injunction against further disposition of the assets of each of the Shareholder Defendants to the extent of all amounts received by each such defendant in connection with the Shareholder Transfers;

(h)     levying execution on the Shareholder Transfers or their proceeds;

(i)     awarding Plaintiffs damages in an amount to be determined at trial;

(j)     awarding Plaintiffs their attorneys' fees, costs, and other expenses incurred in this action;

(k)     awarding Plaintiffs pre- and post-judgment interest at the highest applicable rate; and

(l)     granting such other and further relief as is just and proper.

Dated:  June 3, 2011

Respectfully submitted,

/s/ Charles C. Ashdown
Charles C. Ashdown Ohio Bar #0037269
/s/ Richard S. Wayne
Richard S. Wayne Ohio Bar #0022390
/s/ John M. Levy
John M. Levy Ohio Bar #0077897
/s/ Nicolas D. Wayne

OF COUNSEL:

Nicolas D. Wayne Ohio Bar #0083690

Daniel H. Golden
David M. Zensky
Stephen M. Baldini
James Chou
Jason L. Goldsmith
AKIN GUMP STRAUSS HAUER
  & FELD LLP
One Bryant Park
New York, NY  10036
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

STRAUSS & TROY
150 E. Fourth Street
Cincinnati, OH  45202-4018
(513) 621-2120 – Telephone
(513) 241-8259 – Facsimile
E-mail:  *ccashdown@strausstroy.com*
E-mail:  *rswayne@strausstroy.com*
E-mail:  *jmlevy@strausstroy.com*
E-mail:  *ndwayne@strausstroy.com*

*Counsel for Plaintiffs, Deutsche Bank Trust Company Americas, et al.*

2572941_1.DOC (2570552v1)

**EXHIBIT A – OHIO**

| Name | Name2 | Address | Shareholder Transfers | | |
|---|---|---|---|---|---|
| | | | Step One | Step Two | Date Unknown |
| AMERICAN ELECTRIC POWER | | | | | |
| BATL PN-NTRS S&P | | | | | |
| BERNARD RABINOWITZ TTEE | | | | | |
| ELECTROLUX HOME PRODUCTS, INC. MASTER TRUST | | | | | |
| FIFTH THIRD BANK | | | | | |
| FIFTH THIRD BANK, TRUSTEE | | | | | |
| FREEDMAN, RICHARD C. | | | | | |
| HUMPHREY, PATIENCE | | | | | |
| HUSSMAN STRATEGIC GROWTH FUND | | | | | |
| KEYBANK NATIONAL ASSOC. | | | | | |
| L.D.C.C. | | | | | |
| LABORERS DISTRICT COUNCIL & CONTRACTORS PENSION FD OF OHIO | | | | | |
| LACHEY, JAMES M | | | | | |
| MICHAEL E BEE TRUST UAD 10/20/2003 | | | | | |
| NATIONWIDE S&P 500 INDEX FUND | | | | | |
| NVIT S&P 500 INDEX FUND | | | | | |
| OHIO NATIONAL FUND INC. | | | | | |
| PROGRESSIVE CASUALTY INSURANCE | | | | | |
| RB&W/GAMCO | | | | | |
| SCHLANG, GAIL C | | | | | |
| TAFT BROADCASTING | | | | | |
| TAFT, DUDLEY S. | | | | | |
| YESO, CONSTANCE TOLBERT | | | | | |